IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LIA NETWORK, TERRI HALL, RACHEL VICKERS,<br>*Plaintiffs* | § § § § | |
| | § | SA-24-CV-00403-XR |
| -vs- | § § | |
| THE CITY OF KERRVILLE,<br>*Defendant* | § § § § | |

### ORDER

On this date, the Court considered the status of this case. For the following reasons, the Court **DENIES** Plaintiffs' motion for temporary restraining order and preliminary injunction (ECF No. 4).

### BACKGROUND

Plaintiffs Liberty in Action Network ("LIA")[1], Terri Hall[2], and Rachel Vickers allege that Defendant City of Kerrville's Ordinance No. 2024-03 ("the Peddlers and Solicitors Ordinance") and Ordinance No. 2023-20 ("the Electioneering Ordinance") violate the First Amendment.

On March 26, 2024, the Kerrville City Council passed the Peddlers and Solicitors Ordinance. ECF No. 1 ¶ 3. Plaintiffs challenge four provisions of this Ordinance.

First, Plaintiffs challenge Section 30-182, 184 et. seq. ("The Permitting Provision"), which renders it "unlawful for any person to engage in peddling or solicitation activities within the City

---

[1] In the Complaint, LIA Network is described as operating as "We the People - Liberty in Action" and is a "grassroots nonprofit organization located in Kerrville Texas." ECF No. 1 ¶ 6. No evidence was otherwise provided regarding how many members are part of this organization, whether anyone beside Plaintiff Vickers is a resident of Kerrville, Texas, what the organizational structure looks like, and who authorized this lawsuit to be filed on its behalf.
[2] It is uncontested that Plaintiff Terri Hall is not a resident of the City of Kerrville, Texas.

1

without first obtaining a permit issued by the City Manager."[3] ECF No. 10-1 at 11. The Permitting Provision exempts canvassers[4] from this permitting requirement. *Id.*

Section 30-186 of the Permitting Provision requires that applicants file an application with the City Manager. ECF No. 10-1 at 12. Upon submission of the permit application, the police department "shall obtain the applicant's fingerprints and run a background check on the applicant." *Id.* at 12–13. The City shall then issue a permit within 10 business days of receiving an "administratively complete" application unless (1) the applicant is convicted of a felony or misdemeanor that "relates to the conduct of a business or results from an assault against a person;" (2) the applicant falsified information on the application; or (3) the applicant is a sex offender. *Id.* at 12. Any official "other than the City Manager" can revoke this permit for several enumerated reasons, including "[c]onducting the business of peddling or soliciting in an unlawful manner or in such a manner as to constitute a breach of the peace or to constitute a menace to the health, safety, and general welfare of the public." *Id.* at 15. A permit holder may appeal the act of denial or revocation to the City Manager, with the City Manager issuing a final and conclusive opinion within 5 business days of receipt of the appeal. ECF No. 10-1 at 16.

Second, Plaintiffs challenge Section 30-179 ("the Hours Provision"), which provides:

> It is unlawful for any person, whether permitted or exempted from needing a permit, to peddle, solicit, or canvass at residences between the hours of 8:00

---

[3] Section 30-178 defines a peddler as "a person who attempts to make personal contact with a resident at his or her residence without prior specific invitation or appointment from the resident for the primary purpose of attempting to sell goods, merchandise, wares, or other personal property of any nature or service." ECF No. 10-1 at 9. This Section defines a solicitor as "any person who goes upon the premises of any residence in the City, not having been invited by the occupant thereof for the purpose of taking or attempting to take orders for the sale of goods, merchandise, wares, or other personal property of any nature for future delivery, or for services to be performed in the future. This definition includes any person who, without invitation, goes upon the premises of any residence in the City to request a contribution of funds or anything of value, or sell goods or services for educational, political, charitable, religious, or other non-commercial purposes." *Id* at 10.

[4] Section 30-178 defines a canvasser as "a person who attempts to make personal contact with a resident at his or her residence without prior specific invitation or appointment from the resident for the primary purpose of (1) attempting to enlist support for or against a particular religion, philosophy, ideology, political party, issue, or candidate, even if incidental to such purpose the canvasser accepts the donation for money for or against such cause; or (2) distributing a handbill or flyer advertising a non-commercial event or service." ECF No. 10-1 at 9.

> p.m. and 8:00 a.m. unless permission is otherwise posted by the private property owner or by someone with apparent authority to act for the owner. This section does not apply where the peddler, solicitor, or canvasser is on the property by express, prior invitation of the owner of the property or a person residing on the premises.

*Id.* at 10-1.

Third, Plaintiffs challenge Section 30-180 ("the Signs Provision"). This provision prohibits:

> any person to peddle, solicit, or canvass upon any private property in the City where the owner, occupant, or person legally in charge of the premises has posted at the entry to the premises, or at the entry to the principal building on the premises, a sign bearing the words "No Solicitors", "No Trespassing", or words of similar intent.

*Id.*

Fourth, Plaintiffs challenge Section 30-183 ("Public Property Provision"), which outlaws:

> any person to peddle, hawk, sell, solicit, distribute, or take orders for any services, wares, merchandise, or goods, including magazines, encyclopedias, tools, photographs, flowers, candy, or plants on the streets, street rights-of-way, or medians of the City. This prohibition shall apply to and include any institution or group organized for a political, religious, or charitable purpose, or individuals engaging in such commercial activities on behalf of any such institution or group.

*Id.* at 11. This Public Property Provision provides that "[n]o permit provided herein shall be issued for selling in the above manner." *Id.* This Section also provides that an exception applies to vendors "authorized to sell within the City's parks and recreational areas." *Id.*

In addition to Plaintiffs' challenges to the Peddlers and Solicitors Ordinance, Plaintiffs challenge the Electioneering Ordinance in its entirety. On June 23, 2023, the Kerrville City Council passed this Ordinance, which amends Chapter 70 ("Offenses and Miscellaneous") of Kerrville's Code of Ordinances. ECF No. 1 ¶ 25.

This Ordinance defines electioneering as "the posting, use, or distribution of political signs or literature, including the use of tents, chairs, booths, tables, or other furniture or devices to post,

3

use, or distribute political signs or literature." ECF No. 10-1 at 20. It then specifies the following regulations to "apply to electioneering at a polling place during the voting period:"

1. It is unlawful for a person to leave an electioneering sign or literature at a polling place other than during the voting period and for thirty minutes before and after the voting period.
2. It is unlawful for a person to engage in electioneering on driveways at a polling place. This restriction does not apply to areas specifically designated for such activities or to electioneering signs that are attached to vehicles that are lawfully parked at the polling place. In addition and where an election is occurring at the Auditorium, each candidate or a supporter of a measure may set up and use one (1) tent or a temporary shade structure within an area designated by the City Manager for electioneering. Such activities may only occur in an area that is beyond 240 feet from an outside door through which a voter may enter a building in which a polling place is located. The City Manager shall communicate the boundaries of this area to the candidates and others inclined to make use of this area for electioneering…
3. It is unlawful for a person to disrupt, or attempt to disrupt, the voting process by accosting, harassing, or intimidating any person traveling to or from the building used as the polling place.
4. It is unlawful for a person to attach, place, or otherwise affix an electioneering sign, literature, or material to any building, tree, shrub, pole, or other improvement at the polling place. In addition, it is unlawful for a person to install such a sign using posts in ways that may damage underground utility or irrigation lines. "Posts" include wooden, metal, rebar, or plastic stakes.
5. It is unlawful for a person to place an electioneering sign that is larger than eighteen (18) inches by twenty four (24) inches within (10) feet of a public walkway or right-of-way that is adjacent to the polling place, which includes any sidewalk.
6. It is unlawful for a person to place a sign in a way that obstructs the free age of vehicles or persons or obstructs or interferes with the visibility of traffic.
7. It is unlawful for any person to place a sign within one hundred (100) feet of an outside door through which a voter may enter a building in which a polling place is located.
8. It is unlawful for a person to place an electioneering sign at a polling place that exceeds thirty-six (36) square feet, exceeds eight (8) feet in height, including any supporting poles, and which uses lights.
9. No more than ten (10) signs regarding a candidate, measure, or political party may be used, placed, or erected at the polling place, to include signs affixed to vehicles, which the owner or operator shall remain on the premises. "Signs" include banners, ground signs, hand-held signs,

       magnetic signs greater than 36 square inches, billboard-type signs, and posters.
10. It is unlawful for a person, within 1,000 feet of a building in which a polling place is located, to operate a sound amplification device or a vehicle with a loudspeaker while the device or loudspeaker is being used for the purpose of a) making a political speech; or b) electioneering for or against any candidate, measure, or political party.
11. Out of the ten (10) signs referenced above, no more than 4 (four) signs may be held by any person(s). A person(s) holding a sign(s) may not impede the progress of vehicles or persons, nor use a public walkway or the public right-of-way adjacent to the polling place, including sidewalks.
12. In addition to seeking a criminal penalty, the City Manager or designee may, without notice, remove and provide for temporary storage of electioneering sign(s) located in violation of this section. Thereafter, the City Manager or designee shall attempt to contact the sign owner and arrange a time during normal work hours for the owner or representative to pick-up the sign. If the owner fails to pick up the sign(s) within five (5) business days, the City shall dispose of the signs.
13. The authority to conduct electioneering on public property under this Article is limited to the polling place and only for the voting period, such that at the end of the voting period, all signs and vehicles must be removed.

On April 20, 2024, Defendant communicated to all candidates via an email from City Secretary Shelley McElhannon that it no longer planned to enforce the following provisions: Sec. 70-43 (a)(5), (8), (9), and (11). ECF No. 10-1 at 29.

On Sunday April 21, 2024, City Secretary McElhannon emailed the candidates that there would be "No electioneering on driveways or parking lots except in designated areas and sidewalks beyond 100 feet." ECF No. 10-1 at 31. That same day, City Secretary McElhannon also provided the candidates with an updated map ("Updated Map"), depicting the Cailloux City Center polling center. ECF No. 10-1 at 33. The Updated Map prohibited electioneering within 100 feet of the polling center; marked a specific Electioneering Activities space and a Tenting Staging Area, outside of which electioneering is prohibited; and contained yellow boxes denoting reserved parking for election volunteers. *Id.* at 34.

On April 17, 2024, Plaintiffs initiated this action by filing their Complaint in this Court. ECF No. 1. One day later, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 4), seeking emergency relief in light of early voting beginning on April 22, 2024 for the City of Kerrville elections. ECF No. 4 at 4. Election day is scheduled for May 4, 2024. *Id.* Defendant filed a response brief on April 22, 2024. ECF No. 9.

The Court then held a hearing on Plaintiffs' motion for temporary restraining order ("TRO Hearing") on April 22, 2024. At this TRO Hearing, Plaintiffs made clear that they also challenged the restrictions imposed by the Updated Map as part of their broader challenge to the entire Electioneering Ordinance. ECF No. 12 at 69.

For the following reasons, the Court **DENIES** Plaintiffs' motion for a temporary restraining order.

## LEGAL STANDARD

Rule 65 of the Federal Rules of Civil Procedure governs both preliminary injunctions and temporary restraining orders. See FED. R. CIV. P. 65.

A preliminary injunction will only be granted if the movant demonstrates: "(1) a substantial likelihood that they will prevail on the merits; (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted; (3) their substantial injury outweighs the threatened harm to the party to be enjoined; and (4) granting the preliminary injunction will not disserve the public interest." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013). The "extraordinary remedy" of a preliminary injunction should not be granted "unless the party seeking it has 'clearly carried the burden of persuasion on all four requirements,'" *id.*, and "unequivocally

show[n] the need for its issuance." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997).

## ANALYSIS

Before turning to the merits, the Court must first assess whether each Plaintiff has standing to bring each claim.

### I. STANDING

In order to have standing, a plaintiff must show "(1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Houston Chronicle Publ'g Co. v. City of League City, Tex.,* 488 F.3d 613, 617 (5th Cir. 2007) (citation omitted). An injury in fact is an invasion of a legally protected interest which is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).

In cases involving First Amendment pre-enforcement challenges, simply "chilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Houston Chronicle*, 488 F.3d at 618. A plaintiff thus need not "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Instead, courts examine (1) whether the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest; (2) whether that conduct is arguably proscribed by the challenged policy; and (3) whether the threat of future enforcement is substantial. *Barilla v. City of Houston*, 13 F.4th 427, 431-32 (5th Cir. 2021). In other words, for standing in a pre-enforcement challenge, plaintiffs "must allege 'an intention to engage in a course of conduct arguably affected with a constitutional

interest but proscribed' by the statute." *Nat'l Press Photographers Ass'n v. McCraw*, 504 F. Supp. 3d 568, 578 (W.D. Tex. 2020) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, (1979)). "Specifically, plaintiffs must demonstrate a 'serious [ ] interest [ ]' in acting contrary to a statute." *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 208 (5th Cir. 2011).

Plaintiffs also "bear the burden to demonstrate standing for each claim they seek to press." *Id.; see also In re Gee*, 941 F.3d 153, 161–62 (5th Cir. 2019) ("To ensure that standing is not dispensed in gross, the district court must analyze Plaintiffs' standing to challenge each provision of law at issue.").

Plaintiff LIA can establish standing via either a theory of associational standing or organizational standing.

"Associational standing is a three-part test: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted, nor the relief requested requires participation of individual members." *Texas v. Nuclear Regul. Comm'n*, 78 F.4th 827, 836–37 (5th Cir. 2023).

"By contrast, 'organizational standing' does not depend on the standing of the organization's members. The organization can establish standing in its own name if it 'meets the same standing test that applies to individuals.'" *OCA-Greater Hous.*, 867 F.3d at 610 (citations omitted) (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999)).

The Court now turns to evaluating whether Plaintiffs can establish standing for each of their claims.

A. **Peddlers and Solicitors Ordinance**

   a. *Permitting Provision, Sec. 30-182, 184 et. seq.*

The Permitting Provision renders "it unlawful for any person to engage in peddling or solicitation activities within the City without first obtaining a permit." ECF No. 10-1 at 11. Plaintiffs allege that the Permitting Provision constitutes a prior restraint on constitutionally protected speech, and, consequently, the regulation must be "related to [a] legitimate government interest" and "narrowly drawn to prevent discretionary decision-making." *Beckerman v. City of Tupelo, Miss.*, 664 F.2d 502, 509 (5th Cir. 1981). Plaintiffs allege that the Permitting Provision invests any "official other than the City Manager" with excessive authority as a result of conferring broad authority to revoke permits. ECF No. 4 at 11.

In a pre-enforcement First Amendment challenge, Plaintiffs must demonstrate that they have standing to make such arguments by (i) alleging facts demonstrating their intent to engage in conduct arguably affected with a constitutional interest; (ii) their desired conduct must be arguably proscribed by the Permitting Provision; and (iii) provided that the Permitting Provision is not moribund, the record must lack compelling evidence contravening the presumption that Plaintiffs face a substantial threat of future enforcement. *See Barilla,* 13 F.4th at 433–34.

Here, while Plaintiffs make generalized allegations that they plan to engage in constitutionally protected conduct such as canvassing activities (ECF No. 1 ¶ 34–36, 37, 39), only Plaintiff Vickers specifically alleges that she "would like to knock on her fellow citizens' doors to solicit business for [her window washing business] Just Windows without complying with the requirements of the permitting scheme." ECF No. 1 ¶ 44. In doing so, Vickers has identified her intent to engage in constitutionally protected activities under prong one of the First Amendment standing analysis. *See e.g., Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton,* 536

9

U.S. 150, 165-66 (2002) (religious and political canvassing enjoys First Amendment protection); *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 215 (2023) ("The First Amendment protects commercial speech so long as that speech is not misleading and concerns lawful activity.").

However, Plaintiffs LIA and Hall do not identify any intended conduct that would arguably be proscribed by this permitting scheme. The Permitting Provision only applies to "peddling" and "soliciting," which, as made clear from a plain reading of the definitions of "peddler" and "solicitor," only applies to "mak[ing] personal contact with a resident *at his or her residence*" with respect to peddlers and "go[ing] *upon the premises of any residences* in the City…for the purpose of taking or attempting to take orders for the sale of goods, merchandise, wares, or other personal property" with respect to solicitors. ECF No. 10-1 at 9–10. Plaintiffs LIA and Hall fail to allege that they sought to engage in any door-to-door peddling or soliciting. Further, even if Plaintiffs LIA and Hall had pled that they sought to perform their pamphleteering or issue advocacy door-to-door, such conduct would clearly be captured under the definition of "canvasser," a term explicitly exempted from the permitting requirements. Accordingly, Plaintiffs LIA and Hall fail to demonstrate that they have standing to challenge this provision.[5]

On the other hand, Plaintiff Vickers intended conduct of "knock[ing] on her fellow citizens' doors to solicit business for Just Windows" would be proscribed activity, absent a permit. However, at the TRO Hearing, Plaintiffs' counsel informed the Court that while Plaintiff Vickers

---

[5] At the TRO Hearing, Plaintiffs argued that certain activities, such as soliciting for noncommercial purposes, could fall under the definition of both "canvasser" and "solicitor." Specifically, a canvasser includes those who attempt to enlist support for a "particular religion, philosophy, ideology, political party, issue, or candidate, even if incidental to such purpose the canvasser *accepts the donation for money for or against such cause*." ECF No. 10-1 at 9 (emphasis added). A solicitor then also encompasses anyone who requests "a contribution of funds or anything of value, or sell goods or services for educational, political, charitable, religious or other non-commercial purposes." ECF No. 10-1 at 10. Defendant represented to the Court that "canvasser" was meant to capture requesting donations for LIA or other noncommercial purposes, while "solicitor" was meant to capture commercial solicitations. Because Plaintiffs fail to allege that they intended to engage in the kind of door-to-door requests for donations that might be captured under both definitions, they have not demonstrated standing to pursue such claims.

continued to plead her claim that a permitting requirement to engage in commercial solicitations violated the First Amendment, counsel also conceded that they were not seeking emergency relief under the TRO or arguing an immediate, irreparable harm with respect to this commercial element. ECF No. 12 at 15.  Because Plaintiff has disclaimed the need for emergency relief or the existence of an immediate irreparable harm with respect to this claim, the Court will not analyze Plaintiff Vickers' First Amendment challenge to the Permitting Provision at this stage. *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2018) (the invocation of the First Amendment "cannot substitute for the presence of an imminent, non-speculative irreparable injury").

### b. *Sec. 30-179–Hours Provision*

The Hours Provision renders it "unlawful for any person, whether permitted or exempted from needing a permit, to peddle, solicit, or canvass at residences between the hours of 8:00 p.m. and 8:00 a.m. unless permission is otherwise posted by the private property owner or by someone with apparent authority to act for the owner." ECF No. 10-1 at 10.

The Fifth Circuit has previously held that a plaintiff must demonstrate a "serious intent" to engage in proscribed conduct by taking some steps toward their desired activity. *See Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018). Plaintiffs failed to do so here.

None of the Plaintiffs argue that they planned to engage in peddling, soliciting, or canvassing between 8:00 p.m. or 8:00 a.m. Indeed, Plaintiffs' counsel acknowledged at the TRO Hearing that they failed to make any such arguments in their submissions. ECF No. 28–29. Plaintiffs simply allege that they "would like to canvass, pass out election pamphlets, and speak with their fellow citizens about the upcoming city council elections in Kerrville, but are chilled because of the unconstitutional and overbroad Ordinance 2024-03." ECF No. 1 ¶ 43. Such generalized allegations, without any indication that they specifically planned to canvass door-to-

door during the prohibited hours, is not sufficient to demonstrate an injury-in-fact. *See Zimmerman,* 881 F.3d 378, 389 (5th Cir. 2018) (finding no First Amendment standing where plaintiffs alleged a serious interest in soliciting funds, but not soliciting funds above the proscribed limit).

Accordingly, the Court finds that Plaintiffs likely cannot establish standing with respect to the Hours Provision.

###### c. *Sec. 30-180–Signs Provision*

The Signs Provision prohibits peddling, soliciting, or canvassing upon any private property in the City where the owner, occupant, or person legally in charge of the premises has posted at the entry to the premises, or at the entry to the principal building on the premises, a sign bearing the words "No Solicitors", "No Trespassing", or words of similar intent. ECF No. 10-1 at 10.

For the same reasons as identified above, neither the Individual Plaintiffs nor LIA have established that they suffered from an injury-in-fact. The record is barren of any indication that Plaintiffs planned to engage in the proscribed conduct of peddling, soliciting, or canvassing at private property bearing "No Solicitors" or "No Trespassing" signs. Without such evidence, the Court cannot find that Plaintiffs have standing to challenge this claim at this stage.

###### d. *Sec. 30-183—Public Property Provision*

The Public Property Provision makes it unlawful for "for any person to peddle, hawk, sell, solicit, distribute, or take orders for any services, wares, merchandise, or goods, including magazines, encyclopedias, tools, photographs, flowers, candy, or plants on the streets, street rights-of-way, or medians of the City." ECF No. 10-1 at 11.

Again, Plaintiffs do not allege that they seriously intended to engage in any conduct prohibited by this provision. Instead, Plaintiffs erroneously insist, "A plain reading of the Public

Property Provisions would ban distribution of voter guides on sidewalks and soliciting donations for political purposes." ECF No. 4 at 12. Not so. The plain text of the Public Property Provision does not include the word "sidewalk." Further, City Attorney Mike Hayes submitted an affidavit affirming, "Plaintiffs' allegation that Sec. 30-183 of Ord. No. 2024-03 prohibits activity on sidewalks is mistaken. No activity is prohibited on sidewalks under Sec. 30-183." ECF No. 10 at 4. Likewise, City Attorney Hayes clarified that the Ordinance "does not prohibit persons from residential block walking to provide information and ask for donations." *Id.* Finally, as also made clear by the plain language of the statute and affirmed by City Attorney Hayes, the statute "does not prohibit canvassing on City sidewalks." *Id.*

Courts may consider limiting constructions proffered by government actors. *Vil. Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495 n.5 (1982). Because the Ordinance is "readily susceptible to such a construction," the Court accepts the City's proffered interpretation that "sidewalks" are not covered by the Public Property Provision. *United States v. Stevens*, 559 U.S. 460, 481 (2010). Accordingly, Plaintiffs cannot rely on their intended block walking or other sidewalk solicitations as intended conduct proscribed by the statute to justify standing. Instead, they must identify intended activity that is prohibited on the "streets, street rights-of-way, or medians of the City." ECF No. 10-1 at 11.

Plaintiff LIA offers no indication that its members plan to engage in prohibited activities in streets, street rights-of-way, or medians of the City. In contrast, Plaintiffs Vickers and Hall allege that they engage in "street evangelism." ECF No. 1 ¶ 38; ECF No. 4-2 at 33. However, in the only description as to what constitutes "street evangelism," Plaintiff Hall describes this practice as "often involv[ing] the distribution of gospel tracts on sidewalks in Kerrville," not in any proscribed location. *Id.* Likewise, in her declaration, Plaintiff Hall explains, "The city manager

13

and city attorney made clear the city sidewalks and rights of way (where our youth engage in street evangelism) would be adversely affected by [the Public Property Provision]. It can also affect activity in Louis Hays or other city parks if you're on sidewalks or anything they consider a median or city right of way (which captures more than the streets or sidewalks themselves)." ECF No. 4-2 at 30. Although this constitutes a generalized concern regarding the Public Property Provision, it does not articulate a serious interest to engage in proscribed conduct. *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545 (5th Cir. 2008) ("Without concrete plans or any objective evidence to demonstrate a 'serious interest' [to engage in proscribed conduct], [plaintiff] suffered no threat of *imminent injury*."); *see also Whitmore v. Arkansas*, 495 U.S. 149, 155-56, (1990) ("A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing.")

Because the Court is not convinced that Plaintiffs have established standing for emergency relief, Plaintiffs' motion for a temporary restraining order with respect to the Public Property Provision is **DENIED**.[6]

## B. Electioneering Provision

Again, Plaintiffs' motion for a temporary restraining order suffers from the fatal flaw that it does not specify how these parties have standing to challenge each individual provision of the Electioneering Ordinance.

---

[6] At the TRO Hearing, Plaintiffs' counsel raised concerns that the Public Property Provision risked capturing such conduct as the distribution of a candidate pamphlet as a magazine but explained "the primary concern is the sidewalks." ECF No. 12 at 47. Plaintiffs' counsel also articulated that Plaintiffs may want to distribute materials as "it would probably be incidental to step into the street to talk to somebody." *Id.* at 44, 48. At this stage, the Court declines to find that this is sufficient to establish a serious intent to engage in conduct proscribed by the Public Property Provision. *Abbot,* 647 F.3d 202, 209 (finding plaintiffs "assertions before this court that they are 'seriously interested' in" acting in a proscribed manner "fail to satisfy the irreducible constitutional minimum of standing").

### a. Sec. 70(a)(5), (8), (9), and (11)

First, as affirmed by City Attorney Mike Hayes, the City no longer plans to enforce Sec. 70(a)(5), (8), (9), and (11) during this election cycle. ECF No. 10 at 3. These provisions concern restrictions on the size of signs (70(a)(5), (8)); restrictions on the number of signs (70(a)(9)); and restrictions on the number of signs which may be held by any person (70(a)(11)). The City Secretary Shelley McElhannon communicated this decision to all candidates on April 20, 2024. ECF No. 10-1 at 29. At the TRO hearing, Defendant again confirmed that the City did not plan to enforce these provisions during this City of Kerrville election. ECF No. 12 at 56.

In a pre-enforcement First Amendment challenge, courts "may assume a substantial threat of future enforcement absent compelling contrary evidence, provided that the [Ordinance] is not moribund." *Barilla*, 13 F.4th at 433-34. Unlike in *Barilla*, where the "City did not disclaim its intent to enforce the Ordinance," Defendant has communicated to both this Court and the candidates that it will not be enforcing these provisions. *Id.* Under these circumstances, the Court finds that Plaintiffs have not demonstrated a "substantial threat of future enforcement" necessary to establish standing with respect to these provisions to secure emergency relief.

### b. Sec. 70-43(a)(1), (a)(3), (a)(4), (a)(6), (a)(7), (a)(10), (a)(12), and (a)(13)

Yet again, Plaintiffs do not provide any indication that they seriously intend to engage in conduct proscribed by Section 70-43(a)(1) (leaving an electioneering sign at a polling place for thirty minutes before or after the voting period); (a)(3) (disrupting the voting process by harassing or intimidating any person travelling to or from the building used as the polling place); (a)(4) (attaching electioneering signs to polling places or installing signs in such a way that damage irrigation lines); (a)(6) (obstructing the free passage of vehicles); (a)(7) (placing a sign within 100 feet of an outside door); (a)(10) (operating a sound amplification device of a vehicle with a

15

loudspeaker for electioneering purposes); (a)(12) (empowering the City Manager to remove signs located in violation of other Electioneering Ordinance provisions); or (a)(13) (leaving signs or vehicles at the polling place after the voting period ends). *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018) (finding no standing where plaintiff failed to establish a serious intention to engage in conduct proscribed by law). Accordingly, the Court cannot find standing to challenge these claims at this point.

### c. Section 70-43(a)(2), Updated Map Challenge

Section 70-43(a)(2) allows for each candidate or a supporter of a measure to "set up and use (1) tent or a temporary shade structure within an area designated by the City Manager for electioneering. Such activities may only occur in an area that is beyond 240 feet from an outside door through which a voter may enter a building in which a polling place is located..." ECF No. 10-1 at 21. Defendant subsequently communicated its plan to amend this Section. Specifically, in an email dated Sunday, April 21, 2024, Defendant provided a new map that permitted "electioneering activities" outside of only the "Tent Staging Area" and now within 100 feet, rather than 240 feet, from the polling facility. ECF No. 10-1 at 33-34. That same day, the City Secretary also sent an email to all candidates, specifying "No electioneering on driveways or parking lots except in designated areas and sidewalks beyond 100 feet." ECF No. 10-1 at 31. At the TRO Hearing, Plaintiffs made plain that they also challenge these amended provisions. ECF No. 12 at 69.

Plaintiff Hall does not allege that she intended to engage in any activity proscribed by Section 70-43(a)(2) or the Updated Map. Specifically, Plaintiff Hall alleges that she and LIA regularly "hold[] signs and distribut[] voter guides at polling locations (on sidewalks)." ECF No.

16

4-2 at 29. Under Defendant's updated electioneering policy, Plaintiff Hall's plans to distribute campaign materials on the surrounding sidewalks is permissible.[7]

Plaintiff Vickers has arguably articulated a serious intent to engage in constitutionally protected activity proscribed by Section 70-43(a)(2), as amended by the Updated Map. Plaintiff Vickers serves as the precinct chair for Precinct 314 of the Kerr County Republican Party. ECF No. 4-2 at 33. She explained that in a previous election, she was able to "walk the parking lot and speak with voters," but that this "new ordinance will not allow me to do so." ECF No. 4-2 at 34. Plaintiff Vickers alleges that such a restriction is "a violation of my right to electioneer and the right of the citizens in my precinct to receive education and information at the polls to vote for the candidate that aligns with their values." *Id.* Such electioneering conduct enjoys constitutional protection. *Wiggins v. Lowndes Cty., Miss.,* 363 F.3d 387, 390 (5th Cir. 2004) ("Political speech regarding a public election lies at the core of matters of public concern protected by the First Amendment.") Plaintiff Vickers has likely also articulated a serious interest in engaging in the proscribed activity of electioneering outside of the designated Electioneering Zone. *See e.g., Justice v. Hoseman*, 771 F.3d 285, 290 (5th Cir. 2014) (finding "past enthusiastic participation in the political process" and their membership in political organizations showed that, if not for the challenged laws, they would have engaged in political activism that implicated the challenged laws).

---

[7] Plaintiff LIA expressed that it would like to "erect a tent for shade, and to electioneer generally in the areas more than 100 feet but less than 240 feet from the door of city-owned polling locations" in violation of Section 70-43(a)(2). ECF No. 1 ¶ 42. However, Plaintiffs have not provided the Court with a factual record sufficient to determine whether Plaintiff LIA could assert either associational or organizational standing. Indeed, it is not even clear to the Court whether Plaintiff Vickers is a member of Plaintiff LIA. Plaintiffs' Complaint also fails to plead any theory of standing for LIA. Due to such pleading deficiencies, the Court cannot find that Plaintiff LIA can assert standing at this point. *See Renne v. Geary,* 501 U.S. 312, 316 (1991) ("It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.")

Finally, the Court assesses whether Plaintiff Vickers has adequately pled that the threat of future enforcement is substantial. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–64 (2014). Here, a pre-enforcement First Amendment challenge, the Court may assume a substantial threat of future enforcement absent compelling contrary evidence, provided that the provision is not moribund. *Babbitt*, 442 U.S. at 302. Because Defendant has not disclaimed its intent to enforce this provision, Plaintiff Vickers has likely adequately pled a justiciable injury.

However, Plaintiff Vickers probably has not demonstrated her likely success on the merits to justify injunctive relief. Plaintiffs insist that the Electioneering Ordinance, which prohibits the distribution of "*political* signs or literature" but no other kinds of literature, is content-based. But even assuming without deciding that this was a facially content-based restriction on political speech in a public forum,[8] Plaintiff Vickers has not demonstrated that these restrictions could not survive the exacting strict scrutiny standard that the "regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Plaintiff argued at the hearing on this matter that individuals or groups could place their tents (and presumably chairs) anywhere in the parking lot of the polling station as they saw fit with the City being unable to restrict them, as long as they are outside the State mandated 100 feet zone. ECF No. 12 at 57–58, 60–61. She further argued that individuals could roam the parking lot at will, regardless of any impact on traffic flow or safety considerations. *Id.*

---

[8] From the record as it currently exists, the Court also cannot determine whether the parking lot abutting the polling place should be considered a "public forum." *See Garza v. Starr Cty.,* 309 F. Supp. 3d 454, 458 (S.D. Tex. 2018) (finding "parking lots are not traditional public fora--that is, they are fora with the intended purpose of enabling access to County properties, rather than public places historically associated with the free exercise of expressive activities, such as sidewalks, streets, and parks") (quotation omitted).

18

Here, however, Defendant advances a compelling state interest for its electioneering restrictions: the "right to vote freely for the candidate of one's choice is of the essence of a democratic society." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Accordingly, the Supreme Court has concluded that "some restricted zone is necessary in order to serve the States' compelling interests in preventing voter intimidation and election fraud." *Burson v. Freeman,* 504 U.S. 191, 206 (1992) (upholding Tennessee statute precluding electioneering within 100 feet of polling place). The record indicates that Defendant sought to guard against such voter intimidation: City Attorney Mike Hayes declared that the Electioneering Ordinance revisions occurred after Defendant received complaints of "persons harassing voters as they entered the polling location, persons having to walk through a gauntlet of supporters from both sides in order to enter the polling location…persons creating skirmishes between campaigners, and persons setting up shade structures that blocked other persons." ECF No. 10 at 3. Defendant has therefore identified a compelling state interest.

Regarding narrow tailoring, the Court faces the same question as in *Burson*: "The real question then is how large a restricted zone is permissible or sufficiently tailored." *Burson*, 504 U.S. at 208. Here, Defendant has presented evidence that it has offered several alternative spaces for unrestricted electioneering, including the sidewalks, an "Electioneering Activities" space, and "Tent Staging Area." ECF No. 4-2 at 27. Without a more developed factual record, the Court cannot determine whether these actions were sufficiently narrowly tailored. The Court thus

**DENIES** emergency injunctive relief with respect to Section 70-43(a)(2) and Defendant's most recent electioneering maps.[9]

## CONCLUSION

For the reasons detailed above, the Court **DENIES** Plaintiff's motion for temporary restraining order and preliminary injunction (ECF No. 4).

It is so **ORDERED**.

**SIGNED** this 25th day of April, 2024.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

---

[9] In a supplemental filing, Plaintiffs also argued that reserving parking spots for City election officials in front of the Electioneering Activities zone violates their First Amendment rights. *See* ECF No. 10. Plaintiffs have not pointed the Court to any case law explaining how Defendant's policy raises a constitutional concern. As a practical matter, it is also questionable whether the City plans to "enforce" this policy: at the TRO Hearing, Defendant represented that it was considering altering its parking designations to place City election officials further away from the Electioneering Activities zone. ECF No. 12 at 71. Even if Plaintiffs have not explained to the Court how Defendant's policy raises a clear constitutional concern, Defendant directing City election officials to park their vehicles at a more distant location from the Electioneering Activities zone identified at the TRO Hearing may alleviate Plaintiffs' concerns.