IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LIA NETWORK, TERRI HALL, RACHEL VICKERS, | § § § | |
| *Plaintiffs* | § § | SA-24-CV-00403-XR |
| -vs- | § § | |
| THE CITY OF KERRVILLE, | § § | |
| *Defendant* | § | |

## ORDER

On this date, the Court considered the status of this case. For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion for preliminary injunction (ECF No. 42).

## BACKGROUND

Plaintiffs Liberty in Action Network ("LIA"),[1] LIA director Terri Hall,[2] and LIA volunteer Rachel Vickers[3] (the "Individual Plaintiffs"), allege that Defendant City of Kerrville's Ordinance 2024-15 ("the Electioneering Ordinance") and Ordinance No. 2024-16 ("the Canvassers and Solicitors Ordinance") violate the First Amendment.

These ordinances amend Ordinances Nos. 2023-20 and 2024-03, respectively. On April 18, 2024, Plaintiffs filed a motion for a temporary restraining order, requesting that the Court enjoin Defendant from enforcing Ordinances Nos. 2023-20 and 2024-03. ECF No. 4. After holding oral argument on April 22, 2024, the Court issued an Order denying Plaintiffs' motion for emergency relief on April 25, 2024. ECF No. 13.

---

[1] In the Second Amended Complaint, LIA Network is described as operating as "We the People - Liberty in Action" and is a "grassroots Texas Domestic Nonprofit Corporation classified as a 501(c)(4) social welfare organization based in Kerrville, in Kerr County Texas." ECF No. 39 ¶ 6.
[2] It is uncontested that Plaintiff Terri Hall is not a resident of the City of Kerrville, Texas.
[3] Rachel Vickers resides in the City of Kerrville and operates a business within the City.

Defendant subsequently passed the amended Electioneering Ordinance and the Canvassers and Solicitors Ordinance on June 25, 2024. ECF No. 30 at 1. On August 1, 2024, Plaintiffs filed a motion for preliminary injunction, seeking to enjoin Defendant from enforcing the amended Ordinances. ECF No. 42.

Plaintiffs first challenge the Electioneering Ordinance in its entirety. ECF No. 42 at 24. Section 70-43 of the Electioneering Ordinance provides:

> (1) It is prohibited for a member of the public to leave any sign or literature/written materials for distribution on the grounds of a City-owned or City-controlled public building being used as a polling place other than during the voting period each day and for 30 minutes before and after the voting period each day.
>
> (2) It is prohibited for a person to engage in electioneering or to loiter or congregate in driveways leading into the parking lot, medians within the parking lot, driving or walking lanes within the parking lot, or within parking spaces on the grounds of a City owned or City-controlled public building being used as a polling place. This restriction does not apply to areas within the parking lot specifically designated for electioneering or to electioneering signs that are attached to vehicles that are lawfully parked on the grounds of a City-owned or City-controlled public building being used as a polling place. For elections held at the Auditorium, electioneering within the parking lot may only occur in the designated area(s) shown on the map below and may only occur during the voting period each day and for 30 minutes before and after the voting period each day. For elections held at the Auditorium, electioneering may take place on the sidewalks beyond the 100 foot buffer zone required by section 61.003 of the Code. Additionally, for elections held at the Auditorium., electioneering may take place on the greenspace between the Auditorium and Jefferson Street during the voting period each day and for 30 minutes before and after the voting period each day. For elections held at the Auditorium, members of the public may set up shade structures only within the greenspace between the Auditorium and Jefferson Street beginning 30 minutes before and continuing until 30 minutes after the voting period each day, provided that they do not install such structures using posts in ways that may damage any underground utility or irrigation lines. The City Manager is authorized to identify spaces within the areas specified for electioneering and assign these to persons based upon a rotating lottery system that changes daily. Shade structures are not permitted anywhere within the Auditorium parking lot. For elections held at the Auditorium, up to 50 parking spaces will be reserved for use by voters who will not remain on the grounds for more than 15 minutes after they have voted. The map below shows 49 parking spaces that will be reserved for such voters when the Auditorium is used as a polling place unless

circumstances prevent these parking spaces from being used during any voting period. Should conditions at the Auditorium prevent the use of this area, such as construction activities, the City Manager is authorized to designate a comparable area. Upon. making this decision, the City Manager shall notify the City Council and candidates. In addition, if a different, public, building belonging to the City is used as a polling place, and for which the City controls the election, the City Manager shall communicate to the candidates and the public the boundaries of the area(s) where electioneering is permitted on the grounds of the public building as well as the parking spaces reserved for use by voters who will not remain on the grounds for more than 15 minutes after they have voted. The City Manager will physically mark the boundaries of these areas and will clearly mark the parking spaces reserved for voters who will not remain on the grounds more than 15 minutes after they have voted.

(3) It is prohibited for a person to disrupt, or attempt to disrupt, the voting process by accosting, harassing, obstructing, or intimidating any person traveling to or from the building being used as the polling place.

(4) It is prohibited for a member of the public to attach, place, or otherwise affix any sign, literature, or written material to any building, tree, shrub, pole, or other improvement on the grounds of a City-owned or City-controlled public building being used as a polling place. In addition, it is prohibited for a member of the public to install or place a sign, table, chair, shade structure, or any other device using posts, in ways that may damage underground utility or irrigation lines on the grounds of a City-owned or City-controlled public building being used as a polling place. Posts include wooden, metal, rebar, or plastic stakes.

(5) It is prohibited for a member of the public to hold or place a sign in a way that obstructs the free passage of vehicles or persons or interferes with traffic sight lines or visibility on the grounds of a City-owned or City-controlled public building being used as a polling place.

(6) It is prohibited for a member of the public, within 1,000 feet of a building in which a polling place is located, to operate a sound amplification device or a vehicle with a loudspeaker while the device or loudspeaker is being used.

(7) The City Manager or designee may, without notice, remove and provide for temporary storage of sign(s) which violates a provision of this Article. Thereafter, the City Manager or designee shall attempt to contact the sign owner and arrange a time during normal work hours for the owner or representative to pick-up the sign. If the owner fails to pick up the sign(s) within five business days, the City shall dispose of the signs. Except as provided in this Article, members of the public are prohibited from engaging in electioneering, loitering, congregating, setting up shade structures, and installing signs on the grounds of the Auditorium or the grounds of any other City-owned building which is used as a polling place.

(8) Except as provided in this Article, members of the public are prohibited from engaging in electioneering, loitering, congregating, setting up

3

shade structures, and installing signs on the grounds of the Auditorium or the grounds of any other City-owned building which is used as a polling place.

ECF No. 41-1 at 5–7.

Besides the Electioneering Ordinance, Plaintiffs challenge five provisions of the Canvassers and Solicitors Ordinance.

First, Plaintiffs challenge Section 30-182, 184 et seq. ("the Permitting Provision"), which renders it "unlawful for any person to engage in peddling or solicitation activities within the City without first obtaining a permit issued by the City Manager."[4] ECF No. 41-2 at 6. The Permitting Provision exempts canvassers[5] from this permitting requirement. *Id.*

Section 30-186 of the Permitting Provision requires that applicants file an application with the City Manager. ECF No. 41-2 at 7. Upon submission of the permit application, the police department "shall obtain the applicant's fingerprints and run a background check on the applicant." *Id.* at 8. The City "shall" then issue a permit within 10 business days of receiving an "administratively complete" application unless (1) the applicant's conviction of a felony or misdemeanor "relates to the conduct of a business or results from an assault against a person;" (2) an investigation reveals that the applicant falsified information on the application; or (3) the

---

[4] Section 30-178 defines a peddler as "person who attempts to make personal contact with a resident at his or her residence without prior specific invitation or appointment from the resident for the primary purpose of attempting to sell goods, merchandise, wares, or other personal property of any nature or service." ECF No. 41-2 at 4. This Section defines a solicitor as "a person who attempts to make personal contact with a resident at his or her residence without prior specific invitation or appointment from the resident for the primary purpose of taking or attempting to take orders for the sale of goods, merchandise, wares, or other personal property of any nature for future delivery, or for services to be performed in the future. This definition includes a person, who attempts to make personal contact with a resident at his or her residence without prior specific invitation or appointment from the resident for the primary purpose of requesting a contribution of funds or anything of value, or selling goods or services for educational, political, charitable, religious, or other non-commercial purposes. Distributing a handbill or flyer advertising a service, requesting a contribution of funds or anything of value, advertising services for educational, political, charitable, religious, or other purposes, is considered a 'solicitor.'" *Id* at 5.

[5] Section 30-178 defines a canvasser as "a person who attempts to make personal contact with a resident at his or her residence without prior specific invitation or appointment from the resident for the primary purpose of attempting to enlist support for or against a particular religion, philosophy, ideology, political party, issue, or candidate, even if incidental to such purpose the canvasser accepts the donation for money for or against such cause. Distributing a handbill or flyer advertising an event or service is considered a 'canvasser.'" ECF No. 41-2 at 4.

applicant is a registered sex offender. *Id.* at 9–10. Any official "other than the City Manager" can revoke this permit for several enumerated reasons, including "[c]onducting the business of peddling or soliciting in an unlawful manner or in such a manner as to constitute a breach of the peace or to constitute a menace to the health, safety, and general welfare of the public." *Id.* at 10. A permit holder may appeal the act of denial or revocation to the City Manager, with the City Manager issuing a final and conclusive opinion within 5 business days of receipt of the appeal. *Id.* at 11.

Second, the revised Canvassers and Solicitors Ordinance also includes a permit requirement (Sec. 30-185) for "minor" peddlers and solicitors ("the Minor Permit Provision"). *Id.* at 7. This provision requires a "sponsoring person, company or organization" to apply for a permit for any person under the age of 18 to engage in "peddling or soliciting." *Id.* The Minor Permit Provision also requires, "The sponsor shall provide to each individual peddling or soliciting under its authority a badge or other easily readable form of identification that identifies the name of the sponsor and the name of the individual. The sponsor shall require all individuals to wear the identification so that it is clearly visible at all times while peddling or soliciting." *Id*.

Third, Plaintiffs challenge Section 30-179 ("the Hours Provision"), which provides:

> It is unlawful for any person, whether permitted or exempted from needing a permit, to peddle, solicit, or canvass at residences between the hours of 8:00 p.m. and 8:00 a.m. unless permission is otherwise posted by the private property owner or by someone with apparent authority to act for the owner. This section does not apply where the peddler, solicitor, or canvasser is on the property by express, prior invitation of the owner of the property or a person residing on the premises.

*Id.* at 5.

Fourth, Plaintiffs challenge Section 30-180 ("the Signs Provision"). This provision prohibits:

> any person to peddle, solicit, or canvass upon any private property in the City where the owner, occupant, or person legally in charge of the premises has posted at the entry to the premises, or at an entry or entries to the principal building on the premises, and in a visible manner to persons entering the property, a sign bearing the words "No Solicitors", "No Trespassing", or words of similar intent.

*Id.*

Fifth, Plaintiffs challenge Section 30-183 ("Public Property Provision"), which outlaws:

> any person, to engage in commercial activities within the streets, street rights-of-way, or medians of the City. Commercial activities include selling, peddling, soliciting, hawking, or distributing orders for any services, wares, merchandise, or goods, such as flowers, candy, plants, or magazines. This prohibition does not include sidewalks or similar areas within the right-of-way but for which vehicles do not travel or use. This prohibition shall apply to and include any institution or group organized for a political, religious, or charitable purpose, or individuals engaging in such commercial activities on behalf of any such institution or group.

*Id.* at 6. This Public Property Provision provides that "[n]o permit provided herein shall be issued for selling in the above manner." *Id.* This section also provides that an exception applies to vendors "authorized to sell within the City's parks and recreational areas." *Id.*

The Court held preliminary injunction hearings on August 26, 2024 and September 5, 2024. For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion for a preliminary injunction.

## LEGAL STANDARD

Rule 65 of the Federal Rules of Civil Procedure governs both preliminary injunctions and temporary restraining orders. See FED. R. CIV. P. 65.

A preliminary injunction will only be granted if the movant demonstrates: "(1) a substantial likelihood that they will prevail on the merits; (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted; (3) their substantial injury outweighs the

threatened harm to the party to be enjoined; and (4) granting the preliminary injunction will not disserve the public interest." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013). The "extraordinary remedy" of a preliminary injunction should not be granted "unless the party seeking it has 'clearly carried the burden of persuasion on all four requirements,'" *id.*, and "unequivocally show[n] the need for its issuance." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997).

## ANALYSIS

### I. STANDING

Before turning to the merits, the Court must first assess whether each Plaintiff has standing to bring each claim. To have standing, a plaintiff must show "(1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Houston Chronicle Publ'g Co. v. City of League City, Tex.,* 488 F.3d 613, 617 (5th Cir. 2007) (citation omitted). An injury in fact is an invasion of a legally protected interest which is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).

In cases involving First Amendment pre-enforcement challenges, simply "chilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Houston Chronicle*, 488 F.3d at 618. A plaintiff thus need not "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Instead, courts examine (1) whether the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest; (2) whether that conduct is arguably proscribed by the challenged policy;

and (3) whether the threat of future enforcement is substantial. *Barilla v. City of Houston*, 13 F.4th 427, 431-32 (5th Cir. 2021). In other words, for standing in a pre-enforcement challenge, plaintiffs "must allege 'an intention to engage in a course of conduct arguably affected with a constitutional interest but proscribed' by the statute." *Nat'l Press Photographers Ass'n v. McCraw*, 504 F. Supp. 3d 568, 578 (W.D. Tex. 2020) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). "Specifically, plaintiffs must demonstrate a 'serious [ ] interest [ ]' in acting contrary to a statute." *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 208 (5th Cir. 2011) (quoting *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545 n.8 (5th Cir. 2008)).

Plaintiffs also "bear the burden to demonstrate standing for each claim they seek to press." *Id.; see also In re Gee*, 941 F.3d 153, 161–62 (5th Cir. 2019) ("To ensure that standing is not dispensed in gross, the district court must analyze Plaintiffs' standing to challenge each provision of law at issue.").

Plaintiff LIA[6] can establish standing via either a theory of organizational standing or, through its members, associational standing.

---

[6] Defendant has challenged whether it has been shown that Hall or her attorneys have the authority to file this lawsuit on behalf of LIA Network. ECF No. 43 at 8. Plaintiffs respond, "this is not a proper objection," that "[i]t goes to the weight of the evidence," and "Defendant has taken no steps to challenge the authority of legal counsel to file this suit on behalf of LIA Network. Moreover, Defendant's own exhibits show that Hall is a director of LIA Network." ECF No. 47 at 4. The mere fact that Hall may be one director does not mean that the Board has given her authority to file suit on behalf of LIA. Otherwise, the Court does not understand Plaintiffs' response to Defendant's objection that "[i]t goes to the weight of the evidence." Nonetheless, in the absence of some showing by Defendant that Plaintiffs' counsel have violated their duties as officers of the court and have brought suit on behalf of an entity when they have no authority to do so, the Court will assume that counsel for the Plaintiffs are acting with authority. The Court notes that par for this proceeding, this issue could have been rectified quite easily by Plaintiffs merely producing to Defendant a copy of the Board minutes whereby the LIA Board authorized this suit to be filed and authorized counsel to be retained.

Defendant also challenged the ability of LIA Network to bring suit, arguing that since LIA Network is a 501(c)(4) entity and its certificate of formation states it will not conduct activity prohibited under the Internal Revenue Code, it was acting ultra vires. ECF No. 44 at 13. This argument presents a unique question. In the absence of the language in the certificate of formation, LIA Network might be able to engage in certain political campaign activities. Doing so, however, may cause it to lose its tax-exempt status and be subject to tax conditions under section 527. *See Freedom Path, Inc. v. IRS*, 913 F. 3d 503 (5th Cir. 2019). But Tex. Bus. Org. Code § 20.002(b)(1) appears to state that an act of a corporation is not invalid because the act was "beyond the scope of the purpose or purposes of the corporation as

"Associational standing is a three-part test: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted, nor the relief requested requires participation of individual members." *Texas v. Nuclear Regul. Comm'n*, 78 F.4th 827, 836–37 (5th Cir. 2023). Participation of individual members is not required where, as here, the association seeks prospective and injunctive relief, rather than individualized damages. *Consumer Data Indus. Ass'n v. Texas*, No. 21-51038, 2023 WL 4744918, at *4 n.7 (5th Cir. July 25, 2023).

"By contrast, 'organizational standing' does not depend on the standing of the organization's members. The organization can establish standing in its own name if it 'meets the same standing test that applies to individuals.'" *OCA-Greater Hous.*, 867 F.3d at 610 (citations omitted) (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999)).

Here, Plaintiffs also assert a facial challenge to the Electioneering Ordinance and Canvassers and Solicitors Ordinance. In the First Amendment context, facial challenges require courts to evaluate whether "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody v. NetChoice, LLC,* 144 S. Ct. 2383, 2397 (2024) (finding in the "singular" First Amendment context, "even a law with a plainly legitimate sweep may be struck down in its entirety. But that is so only if the law's unconstitutional applications substantially outweigh its constitutional ones.") (citation and internal quotations omitted).

---

expressed in the corporation's certificate of formation." The Court will find that LIA is not barred by the ultra vires doctrine from bringing this lawsuit.

With respect to Plaintiff Terri Hall, the Court finds that, even though Plaintiff Hall is not a resident of Kerrville and thus not "neighbors" with the homeowners displaying "No Trespassing" signs she seeks to solicit after 8:00 p.m., Plaintiff Hall has sufficiently pled facts establishing her standing to challenge the Ordinances,[7] with the exception of the Minor Permit provision. Plaintiff Hall has not alleged a serious interest in acting contrary to the Minor Permit provision. Specifically, Plaintiff Hall explains:

> My children under my supervision and under the supervision of other adult volunteers have gone door to door to solicit donations and make sales for various 4-H clubs and events (like selling Wild Game Dinner tickets, Fish Fry tickets, candles, raffle tickets, etc.). The Canvassers and Solicitors prohibits children from engaging in such activities, and requires organizations involving charitable sales and solicitation by children to supervise the children at all times.

ECF No. 42-2 at 5–6. But Plaintiff Hall has misread the Canvassers and Solicitors Ordinance. Sec. 30-182 explicitly exempts just this kind of "temporary sales sponsored by charitable, non-profit organizations including, Boy Scouts and Girl Scouts, service clubs, and school organizations." ECF No. 41-2 at 6. Accordingly, the Court finds that Plaintiff Hall lacks standing to challenge the Minor Permit provision. *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545 (5th Cir. 2008) ("Without concrete plans or any objective evidence to demonstrate a 'serious interest' [to engage in proscribed conduct], [plaintiff] suffered no threat of *imminent injury*."); *see also Whitmore v. Arkansas*, 495 U.S. 149, 155-56, (1990) ("A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing.").[8]

---

[7] Despite that she does not reside in the City of Kerrville, Hall states she is engaged in Kerr County Republican Party activities and frequently visits the City. ECF No. 42-2 at 3.

[8] Because neither Plaintiffs Rachel Vickers nor LIA Network allege a serious interest in violating the Minor Permit provision, the Court finds that no Plaintiff has sufficiently alleged standing to challenge the provision at this juncture.

The Court also finds that Plaintiff Rachel Vickers has standing to challenge the Electioneering Ordinance, as well as the Signs and Permitting Provisions of the Canvassers and Solicitors Ordinance.

The Individual Defendants' injuries are fairly traceable to the City of Kerrville, which is responsible for implementing the Ordinances, and her injuries are likely to be redressed by a favorable judicial decision." *Houston Chronicle,* 488 F.3d at 617. An order declaring that the Ordinances violate the First Amendment and enjoining their enforcement would remove the chill that they allegedly impose on Plaintiffs Hall and Vickers.

Finally, the Court finds that LIA Network, by virtue of the injuries to Hall and Vickers and to its own free speech interests, has standing for purposes of this preliminary injunction request. *Caractor v. City of New York Dep't of Homeless Servs.*, No. 11 CIV. 2990 DLC, 2013 WL 2922436, at *3 (S.D.N.Y. June 14, 2013) ("Organizations, like individuals, [also] enjoy rights to free speech, free exercise, and equal protection of the laws." (citing *Grosjean v. Am. Press Co.*, 297 U.S. 233, 244 (1936)). Like individuals, an organization does not need to affirmatively violate a law to have standing to challenge it. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 579–82 (2023) (considering company's First Amendment pre-enforcement challenge). Instead, the plaintiff need only "aver[] that it intend[s] to do so in the future." *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 927 n.23 (5th Cir. 2023) (citing *303 Creative LLC v. Elenis*, 6 F.4th 1160 (10th Cir. 2021)). Plaintiff LIA Network has done so here. *See* ECF No. 41-2 at 4–11.

The Court now proceeds to the merits analysis.[9]

---

[9] The Court has considered the objections raised in Defendant's objections to Plaintiffs' affidavits submitted in support of their motion for preliminary injunction. *See* ECF No. 43. All objections based on conclusory statements are granted. All other objections are overruled.

## II.    Electioneering Ordinance (Ordinance No. 2024-15)

### A.  Likelihood of Success on the Merits

Electioneering laws present a "particularly difficult reconciliation: the accommodation of the right to engage in political discourse with the right to vote." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 23 (2018). Plaintiffs assert that the Electioneering Ordinance fails to meet the exacting standards required by strict scrutiny.[10]

In the City of Kerrville, Texas, there is only one location where voting takes place in a facility owned by the City—the Kathleen C. Cailloux City Center for the Performing Arts ("the Cailloux Theater"). Accordingly, there is only one location in this case that is governed by the Electioneering Ordinance.[11]

To assess election prohibitions that apply "only in a specific location," the Supreme Court has instructed courts to employ a "forum based approach for assessing restrictions that the government seeks to place on the use of its property." *Minn. Voters All.*, 585 U.S. at 11. The Fifth Circuit has identified "two broad categories of forums: (1) traditional and designated public forums and (2) limited public forums and nonpublic forums." *Freedom from Religion Found., Inc. v. Abbott*, 955 F.3d 417, 426 (5th Cir. 2020). Traditional public forums consist of "sidewalks, streets, and parks that have traditionally been devoted to assembly or debate" and designated public

---

[10] Plaintiffs also assert that the Texas Election Code requires this Court to apply strict scrutiny to any electioneering regulations governing conduct beyond the 100-foot boundary at polling places. ECF No. 42 at 24. However, the plain text of the Texas Election Code provides, "The entity that owns or controls a public building being used as a polling place may not, at any time during the voting period, prohibit electioneering on the building's premises outside of the area described in Subsection (a), *but may enact reasonable regulations concerning the time, place, and manner of electioneering*." TEX. ELEC. CODE § 61.003 (a-1) (emphasis added). Nothing in the Texas Election Code itself indicates that such "reasonable regulations concerning the time, place, and manner of electioneering" requires a strict scrutiny analysis.

[11] On September 4, 2024, Defendant informed the Court that upon request by the Kerr County Republican Party, the Kerr County Commissioners Court decided on August 26, 2024 that the polling location for the November 2024 election will not be the Cailloux Theater but will, instead, be the First Baptist Church located at 625 Washington Street in Kerrville, Texas. Because the City has not revoked the Electioneering Ordinance and the possibility exists the Cailloux Theater may be used for the May 2025 elections, the Court will still consider Plaintiffs' challenge to this Electioneering Ordinance.

forums are "are places that the government has designated for the same widespread use as traditional public forums." *Id.* Such traditional and designated public forums are subject to strict scrutiny review: they "must be narrowly tailored to serve a compelling state interest." *Id.*

In contrast, limited public forums "are places that the government has opened for public expression of particular kinds or by particular groups," while nonpublic forums are "forums that are not open for public communication by tradition or designation." *Id.* In such places, the government's restrictions need only be "(1) reasonable in light of the purpose served by the forum and (2) does not discriminate against speech on the basis of viewpoint." *Id.* at 426–27.

At the August 26 hearing, Susan Burns, a front of house engineer employed by Playhouse 2000, testified that the parking lot in front of the polling facility, the Cailloux Theater, is owned by the City of Kerrville but managed by Playhouse 2000. Ms. Burns also testified that the parking lot and adjoining "grassy area" are only used for Playhouse 2000's theater purposes, unless the Executive Director of Playhouse 2000 provides express permission for an alternative use. Playhouse 2000 also has an agreement with the City of Kerrville, under which elections are held in the Cailloux Theater. Finally, Ms. Burns testified that, except for Playhouse 2000 occasionally providing express permission for a neighboring church to use the parking lot, this parking lot was "not for public use."

Based on the evidence presented, the Court finds that the parking lot and grassy area in front of the Cailloux Theater polling center is a nonpublic or limited public forum not subject to strict scrutiny.[12] As made plain by Ms. Burns's unrebutted testimony, the Cailloux Theater parking lot and adjacent grassy area is not an area which has traditionally been held open for public discourse. The government does not create a public forum by inaction or by permitting limited

---

[12] At the August 26 preliminary hearing, Defendant referenced an updated Electioneering Ordinance map that made plain that the sidewalks surrounding the Cailloux Theater also served as areas designated for electioneering activities.

discourse, but only by intentionally opening a nontraditional forum for public discourse. *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985). Even if the Court determined that this property constituted a limited public forum—a location open by the government for public expression of a specific type—the same standard of analysis as a nonpublic forum would apply. *See Freedom from Religion Found.*, 955 F.3d at 426.

The Court will evaluate Plaintiffs' challenge to the Electioneering Ordinance under the limited public forum and nonpublic forum standard of review. *See United Food & Commer. Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 750 (6th Cir. 2004) (concluding "the parking lots and walkways leading to the polling places are nonpublic forums"); *see also Mansky*, U.S. at 12 ("A polling place in Minnesota qualifies as a nonpublic forum. It is, at least on Election Day, government-controlled property set aside for the sole purpose of voting."). Accordingly, Defendant's Electioneering Ordinance restrictions on speech must be both "reasonable and viewpoint neutral." *Freedom From Religion Found.*, 955 F.3d at 429.

### i.      Sec. 70-43(a)(2), (a)(8)

The Court begins its analysis with two-related provisions. Sec. 70-43(a)(2) of the Electioneering Ordinance provides, "it is prohibited for a person to engage in electioneering or to loiter or congregate in driveways leading into the parking lot, medians within the parking lot, driving or walking lanes within the parking lot, or within parking spaces on the grounds of a City-owned or City-controlled public building being used as a polling place. This restriction does not apply to areas within the parking lot specifically designated for electioneering." ECF No. 41-1 at 5. Section (a)(2) incorporates a "map below" ("the Electioneering Map") into the Electioneering Ordinance that designates the "100-ft Buffer" around the polling center in which electioneering is prohibited, green areas designated as spaces for "Electioneering Activities" ("Electioneering

Zones"), and yellow boxes around certain parking spaces marked as "Voter Parking" ("Voter

Parking Spaces"). ECF No. 41-1 at 9.



APP. 34

ECF No. 55-1 at 9.

Sec. 70-43(a)(8) provides, "Except as provided in this Article, members of the public are

prohibited from engaging in electioneering, loitering, congregating, setting up shade structures,

15

and installing signs on the grounds of the Auditorium or the grounds of any other City-owned building which is used as a polling place." ECF No. 41-1 at 7.

Although Sections (a)(2) and (a)(8) are viewpoint neutral—the definition of "electioneering" applies to the "posting, use, or distribution of political signs or literature" without discriminating between groups, causes, or messages—the Court finds that Plaintiffs have demonstrated a substantial likelihood that portions of these restrictions will not be found "reasonable." At the August 26 hearing, Defendant told the Court that the Electioneering Ordinance prohibited individuals from approaching voters in the parking lot outside the Electioneering Zones to speak with them about voting for a candidate, even if that individual did not distribute political signs or literature pursuant to the definition of electioneering.[13] When asked what language in the statute prohibited walking up to a voter without a sign or literature, Defendant responded that the term "congregating," which was meant to refer to "two people or more hanging out" would capture such conduct. Defendant then informed the Court that individuals were also prohibited from approaching and talking to voters as they entered or exited their vehicles, provided the voters parked in one of the Voter Parking Spots denoted by a yellow box in the Electioneering Map. *See* ECF No. 55-1 at 9.

The Fifth Circuit requires laws that implicate the First Amendment at a nonpublic forum to satisfy a "flexible standard" of reasonableness that requires local governments "only to draw a reasonable line that 'articulate[s] some sensible basis for distinguishing what [speech] may come in from what must stay out.'" *Ostrewich v. Tatum*, 74 F.4th 94, 103 (5th Cir. 2023) (quoting

---

[13] Electioneering is defined as "the posting, use, or distribution of political signs or literature." ECF No. 41-1 at 4. An affidavit from Kerrville City Manager, Dalton Rice, provides, "The term 'political signs or literature' in Ordinance No. 2024-15 refers to signs or literature designed to influence the outcome of an election, including signs or literature for or against any candidate, measure, or political party." ECF No. 45-4 at 3. It is permissible for a court considering a facial challenge to read a city's limiting construction into an ordinance. *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992). In fact, courts must consider limiting constructions proffered by government actors. *Vil. Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.5 (1982).

*Mansky*, 585 U.S. at 16)). Sections (a)(2) and (a)(8) of the Electioneering Ordinance fail to do so: the phrase "congregate" apparently bars *all* speech when approaching voters entering or exiting their vehicles in Voter Parking Spaces and some undefined amount of political advocacy speech when approaching voters in the rest of the parking lot outside of the Electioneering Zones. Compounding this problem, the term "congregate" is nowhere defined in the Electioneering Ordinance.[14] Indeed, the prohibition on speaking to voters in Voter Parking Spaces is nowhere articulated within the text of the Electioneering Ordinance, with Defendant representing that the Electioneering Map itself was somehow meant to communicate such restrictions.[15] In essence, Defendant has prohibited vast swaths of speech, without even defining these limitations in writing. *See Palo Pinto Cnty. Conservatives v. Long*, No. 24-10432, 2024 WL 3833292, at *4 (5th Cir. Aug. 15, 2024) (finding plaintiffs demonstrated a likelihood of success on the merits where the challenged provision failed to define "political," and the county provided no other "definition or limiting principle").

Accordingly, the Court finds that Plaintiffs have demonstrated a likelihood of success with respect to their challenge to the Electioneering Map incorporated in Section (a)(2) to the extent detailed above, as well as to the undefined term "congregate." The Court finds that Plaintiffs have not demonstrated a likelihood of success with respect to any other challenge to Section (a)(2), including Defendant's reasonable and viewpoint neutral restrictions on setting up "shade structures" in specific areas and doing so in a way that does not damage "any underground utility

---

[14] In Defendant's supplemental briefing, Defendant states that Section (a)(2) "prohibits 'hanging out' or gathering in these [non-Electioneering Zone] areas regardless of the content of any communications people might wish to share." ECF No. 57 at 3. This footnote does nothing to clarify the Electioneering Ordinance: it suggests that individuals are prohibited not only from approaching voters in the Voter Parking Spaces, but also anywhere in the parking lot outside of the Electioneering Zones to stop and discuss any topic.

[15] The Court notes the substantial size of the Cailloux Theater parking lot. In the event that Defendant moved its polling place to a smaller site with more limited parking, public safety considerations might justify certain restrictions on approaching voters as they entered or exited their vehicles.

or irrigation lines."[16] Sec. 70-43(a)(2). Defendant also pointed the Court to evidence regarding the reasonableness of permitting viewpoint neutral electioneering activities only in Electioneering Zones.[17]

Further, the Court finds that Plaintiffs have demonstrated a reasonable likelihood of success only with respect to their challenge to the term "congregating" contained in Section (a)(8) for the reasons described above.

### ii.        Remaining Provisions of the Electioneering Ordinance

Plaintiffs have not established a substantial likelihood of success in prevailing on their remaining challenges to the Electioneering Ordinance.

Defendant asserts that these remaining provisions are viewpoint neutral, reasonable efforts to ensure the effective operation of elections free from voter intimidation or harassment. The Court agrees. Defendant provided ample evidence of past incidents of voter intimidation that motivated the passage of the Electioneering Ordinance. For instance, Kerrville City Secretary, Shelly McElhannon, provided an affidavit explaining that in 2020, 2021, 2022, and 2023 elections, she received numerous complaints of harassment and "expressions of fear or unwillingness to vote." ECF No. 45-1 at 3. Defendant also provided declarations from City of Kerrville Council Member,

---

[16] At the September 5 hearing, Kerrville voter, Kathy Bryson, testified that the presence and placement of tents made it more difficult for her and her partner to enter the Cailloux Theater. *See also* ECF No. 56 at 16 (email from Kathy Bryson to Plaintiff Terri Hall dated August 30, 2024, explaining, "The presence of tents and aggressive advocates in front of the polling place was a definite hindrance when I took my disabled partner of 45 years—then in his mid-eighties—to vote in the past. In the very recent past, the absence of tents and aggressive advocates as I made my way to vote made the voting experience much less stressful.").

[17] Defendant's evidence emphasized the City's desire to shield voters from harassment and ensure public safety in the Cailloux Theater parking lot, particularly given that the average age of voters in the Spring 2024 election was 70. ECF No. 57-1 at 4. For example, Kerrville City Secretary, Shelly McElhannon, provided a list of complaints she recorded following the 2023 municipal election, which included multiple allegations of harassment in the parking lot outside the Cailloux Theater. ECF No. 45-1 at 5. Further, at the August 26 hearing, Ms. Burns testified that LIA Network electioneers created traffic delays by stopping each entering vehicle to distribute their voter guides. Indeed, at the September 5 hearing, Ms. Bryson testified that she found the extent of voter harassment to be "traumatic." Finally, Defendant provided a declaration from City Manager Dalton Rice noting Defendant's concerns about public safety in parking lots are supported by City data indicating "that over the last five years more than two (2) crashes have occurred every week in the ten (10) largest parking lots in the City." ECF No. 57-1 at 4.

Brenda Hughes, and Kerrville Deputy City Secretary, Kesha Franchina, detailing intimidation tactics and harassment. *See* ECF Nos. 45-2 and 45-3.[18] At the August 26 hearing, Ms. Burns testified that individuals associated with LIA blocked vehicles entering the parking lot to hand out their leaflets endorsing certain candidates.

In response to such behavior, Defendant passed an Electioneering Ordinance that limits individuals from leaving signs "other than during the voting period each day and for 30 minutes before and after the voting period each day" (Sec. 70-43 (a)(1)); prohibits harassment (Sec. 70-43 (a)(3)); prohibits affixing signs to buildings at the polling place or installing signs in a way that damages underground utility lines (Sec. 70-43 (a)(4)); prohibits placing signs that obstruct the passage of individuals or vehicles (Sec. 70-43 (a)(5)); and prohibits the use of sound amplification devices within 1,000 feet (Sec. 70-43 (a)(6)). Plaintiffs have not shown a substantial likelihood of success in challenging such viewpoint neutral, reasonable restrictions passed in response to past complaints that voters were chilled from voting because they did not want to run the gauntlet of uncivil behavior.[19]

### B. Threat of Irreparable Injury to Plaintiffs

By showing that certain portions of Sections (a)(2) and (a)(8) "represents a substantial threat to [their] First Amendment rights," *Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch.*

---

[18] Specifically, these individuals received complaints of or observed, *inter alia*, "people at the elections site grabbing [] and touching" voters (ECF No. 45-1 at 2); individuals using loudspeakers and bullhorns, which disturbed a local school (*id.* at 2); candidates and their supporters arriving at "midnight to stake out prime spots for their signs and tents, and they laid out their signs in the driveways of the property in a manner that interfered with other people's ability to enter the parking" lot (ECF No. 45-2 at 3); positioning tents in a way to prevent other candidates from posting their own materials (*id.*); and an individual who Ms. Franchina believed was associated with Plaintiff LIA "shaking his fist and pointing his finger in my face" while shouting at her for attempting to discuss signage (ECF No. 45-3 at 2). Ms. Franchina also testified about this incident at the September 5 hearing.

[19] Plaintiffs attempt to cherry pick sentences from Defendant's response brief to Plaintiff's mooted motion for reconsideration of preliminary injunction (ECF No. 30) to suggest that Defendant was motivated not by evidence of voter harassment attested to in multiple affidavits, but rather by an impermissible desire to shield voters from all electioneering activities. Without any other evidence, the Court finds Plaintiffs' argument lacks merit at this stage.

*Dist.*, 88 F.3d 274, 280 (5th Cir. 1996), for the reasons detailed above, Plaintiffs have satisfied the threat of irreparable injury prong with respect to these two sections. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam).

### C. Threatened Injury Outweighs Harm From Injunction and Public Interest

The Court finds that Plaintiffs have sufficiently demonstrated that the threatened injury to Plaintiffs outweighs any harm from granting the preliminary injunction. Finally, the Fifth Circuit permits district courts to issue a preliminary injunction if issuance "will not be adverse to public interest." *Star Satellite, Inc. v. Biloxi*, 779 F.2d 1074, 1079 (5th Cir. 1986). This Court concludes that despite the uncivil behavior exhibited by certain individuals, First Amendment jurisprudence requires the Court to find this factor also weighs in favor of granting an injunction with respect to the identified portions of Sections (a)(2) and (a)(8) of the Electioneering Ordinance. That said, the Court notes that the City has recourse to (a)(3) and other sections, as well as any pertinent portions of the Texas Penal Code or Transportation Code, that allow the City to prevent any disruption, assault, harassment, or intimidation of any voter trying to enter the voting site.

### III.    Canvassers and Solicitors Ordinance (Ordinance No. 2024-16)

#### A. Likelihood of Success on the Merits

##### i.    Permitting Provision (Sec. 30-182, 184 et seq.)

The Permitting Provision of the Canvassers and Solicitors Ordinance renders "it unlawful for any person to engage in peddling or solicitation activities within the City without first obtaining a permit issued by the City Manager." ECF No. 41-2 at 6. Plaintiffs allege that the Permitting Provision constitutes a prior restraint on constitutionally protected speech. ECF No. 42 at 15.

Plaintiffs also argue that the Permitting Provision invests any "official other than the City Manager" with excessive discretion to revoke issued permits. *Id.* at 17.

In *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, the Supreme Court found it "unnecessary" to articulate the appropriate "standard of review" for courts to employ when assessing permitting requirements governing door-to-door canvassing. 536 U.S. 150 (2002). However, the Court noted there "must be a balance" between the government's "interests and the effect of the regulations on the First Amendment rights." *Id.* at 163.

Here, Defendant articulates important government interests served by the Canvassers and Solicitors Ordinance. Specifically, the Ordinance provides that its purpose "is to protect against criminal activity, including fraud and burglary, minimize the unwelcome disturbance of citizens and the disruption of privacy, and to otherwise preserve the public health, safety, and welfare by regulating, controlling, and/or licensing peddlers, solicitors, and canvassers." ECF No. 41-2 at 4. Defendant emphasizes, "27% of the City's population is aged 65 or over, while this same category for Texas is 13.4%." *Id.* at 1. The Supreme Court has consistently recognized "the prevention of fraud, the prevention of crime, and the protection of residents' privacy…are important interests that [a municipality] may seek to safeguard through some form of regulation of solicitation activity." *Watchtower Bible*, 536 U.S. at 164; *see also* V*illage of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 636 (1980) (recognizing all three interests as "substantial").

The Court must balance these interests against the alleged effects of the regulations on Plaintiffs' First Amendment rights. The challenged provision at hand exempts individuals engaged in canvassing—those "attempting to enlist support for or against a particular religion, philosophy, ideology, political party, issue, or candidate"—from Permitting Provision requirements. ECF No. 41-2 at 6. Nonetheless, Plaintiffs Hall and LIA Network complain that the definition of "solicitor"

encompasses "requesting a contribution of funds," an activity they would like to continue to engage in on behalf of LIA Network without needing a permit. ECF No. 42-2 at 7. Likewise, Plaintiff Vickers objects that she wants to "continue to engage in door-to-door solicitation" for her commercial business without first obtaining a permit. ECF No. 42-2 at 20.

In *Watchtower*, the Supreme Court struck down an ordinance prohibiting canvassers from "going in and upon" private residential property to promote any "cause" without first obtaining a permit for the mayor's office. 536 U.S. at 154. Although the Supreme Court recognized "the interests a town may have in some form of regulation, particularly when the solicitation of money is involved," it ultimately concluded that an ordinance "cover[ing] so much speech raises constitutional concerns." *Id.* at 162, 165 ("It is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so."). The Court emphasized that the challenged ordinance "unquestionably applies, not only to religious causes, but to political activity as well." *Id.* at 165.

The Permitting Provision likewise captures religious and political speech because of the broad definition of "solicitor." The Ordinance defines a "solicitor" to include those "[d]istributing a handbill or flyer advertising a service, requesting a contribution of funds or anything of value, *advertising services for educational, political, charitable, religious, or other purposes*." ECF No. 41-2 at 5 (emphasis added). The "breadth of speech affected" by the Permitting Provision thus raises similar constitutional concerns as those addressed in *Watchtower*. *Id.* at 164. Finally, Defendant has not presented the Court with any evidence as to how the Permitting Provision is narrowly tailored to achieving its stated interests. Accordingly, the Court finds that Plaintiffs have

established a likelihood of success with respect to their challenge of the Permitting Provision as a prior restraint.[20]

Plaintiffs next allege that the Permitting Provision provides unfettered discretion to city officials to revoke permits. When ordinances make exercising speech contingent on the will of an official, the ordinance must provide "narrow, objective, and definite standards to guide the licensing authority." *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003). Plaintiffs allege that the Permitting Provision fails this test because it empowers city officials to revoke permits if individuals peddle or solicit "in an unlawful manner or such a manner as to constitute a breach of the peace or to constitute a menace to the health, safety, and general welfare of the public." ECF No. 41-2 at 10.

Yet even if the Court concluded that Plaintiffs demonstrated a substantial likelihood of success in prevailing on this challenge, Plaintiffs could not carry their burden to establish a substantial threat of irreparable injury. The Fifth Circuit has cautioned courts against enjoining a statute based on assumptions of "how [an ordinance] will be applied and determin[ing] its constitutionality in that setting." *Beckerman v. Tupelo*, 664 F.2d 502, 515 (5th Cir. 1981). Accordingly, a movant "seeking a preliminary injunction on First Amendment grounds must do more than suggest that an ordinance may violate the Constitution in future hypothetical scenarios. Rather, the movant must make a clear showing that the ordinance, as written, will necessarily cause irreparable harm to the movant if it is not enjoined." *Herridge v. City of Galveston*, No. 3:18-CV-00160, 2019 WL 423397, at *4 (S.D. Tex. Feb. 4, 2019).

---

[20] At the September 5 hearing, Defendant asserted that the City would not consider Plaintiff Terri Hall's solicitation of funds for political candidates as "solicitation" under certain circumstances. However, Plaintiff Hall made plain she wants to solicit funds on behalf of LIA Network, not only political candidates. ECF No. 42-2 at 7. Further, the definition of solicitor plainly encompasses, "requesting a contribution of funds or anything of value." ECF No. 41-2 at 5. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 336–37 (5th Cir. 2020) (holding "disavowals of any future intention to enforce the policies contrary to the First Amendment are compatible with, and simply reinforce, the open-ended language in those policies").

In the instant case, Plaintiffs simply speculate that, after having applied for and received a license sometime in the future, they will be subject to an unfair revocation. But Plaintiffs' fear of arbitrary and discriminatory treatment alone does not a provide a basis for establishing they suffer an irreparable injury if they are not granted emergency relief. *Id.* (denying motion for preliminary injunction for failure to demonstrate a substantial threat of irreparable injury). On this basis, Plaintiffs' motion for preliminary injunction must be denied with respect to their challenge of the Permitting Provision on vesting excessive discretion in a public official.

### ii. Hours Provision (Sec. 30-179)

The Hours Provision renders it "unlawful for any person, whether permitted or exempted from needing a permit, to peddle, solicit, or canvass at residences between the hours of 8:00 p.m. and 8:00 a.m." ECF No. 41-2 at 5.

"Curfews on door-to-door solicitation are classic time, place, and manner restrictions because, while they limit the times during which solicitation can occur, they do not completely foreclose it." *Ass'n of Cmty. Orgs. for Reform Now v. Town of E. Greenwich*, 453 F. Supp. 2d 394, 406 (D. R.I. 2006), *aff'd*, 239 Fed. App'x. 612 (1st Cir. 2007). The constitutionality of time, place, and manner restrictions depend on whether the restrictions are "justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791.

Here, the Hours Provision applies with equal force to canvassing, soliciting, and peddling, without distinguishing between each type of speech. The Court will thus analyze this provision as a "content-neutral" restriction on speech *See Aptive Envtl., LLC v. Town of Castle Rock*, 959 F.3d 961, 983 n.7 (10th Cir. 2020) (explaining that "content-neutral curfews on door-to-door

solicitation, i.e., those that do not distinguish between commercial and noncommercial speech, have been analyzed as time, place, and manner restrictions in some circumstances") (collecting cases).

Defendant has articulated significant governmental interests in enforcing the Hours Provision. The Canvassers and Solicitors Ordinance defines its purpose as minimizing the unwelcome disturbance of citizens and the disruption of privacy, as well as crime prevention. ECF No. 41-2 at 4. Indeed, the Supreme Court has long recognized "the unique nature of the home" and "that preserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value." *Frisby v. Schultz*, 487 U.S. 474, 484 (1988) (citation and internal quotations omitted). Likewise, the Supreme Court has identified the "prevention of crime" as an important government interest. *See Watchtower Bible*, 536 U.S. at 164.

Plaintiffs respond that the Hours Provision is not narrowly tailored to these stated interests.[21] The Court disagrees. As a starting point, the Court notes that municipalities unquestionably have the power to "regulate the time and manner of solicitation generally, in the interest of public safety, peace, comfort or convenience." *Cantwell v. Connecticut,* 310 U.S. 296, 306–07 (1940). They may impose such regulations to shield its citizens "from annoyance,

---

[21] The Court notes that Plaintiffs argued at the August 26 hearing that no restriction on hours is permissible. Indeed, they argue that they have the right to knock on doors and ring doorbells at 2 a.m. Plaintiffs also challenge the City's provision allowing homeowners to post "No Solicitation" signs and have those requests honored. No Solicitation ordinances, however, are constitutional. *See Am. Cmty. Newspapers, LLC v. City of Plano,* 540 F. Supp. 2d 717 (E.D. Tex. 2008). Plaintiffs' position on the Hours Provision not only impedes on the quietness that residents seek at these evening and bedtime hours, it also leads to the absurd result that every homeowner or renter must post a No Solicitation sign at their property, and apparently the notice will need to be visible and perhaps lit at night. In 2022 and 2023, concerns were raised when protesters demonstrated at Justice Brett Kavanaugh's home. The citizens of Kerrville deserve the same level of solitude and privacy in their homes as they attempt to feed, bathe and put their children to bed and enjoy a few hours of quiet before they retire to a well-deserved rest. Additionally, the Court notes that knocking on doors and ringing doorbells in the wee hours of the night leads to the possibility that solicitors will be shot and homeowners (especially those who posted No Solicitation signs) will believe they have a right to discharge any weapon.

including intrusion upon the hours of rest." *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 144 (1943). Further, the regulation "need not be the least restrictive or least intrusive means of furthering the government's interest." *Ward*, 491 U.S. at 798.

Other courts have upheld curfews as narrowly tailored where the "prohibition applies only to those hours during which solicitation is most intrusive on residents' privacy and during which there is an increased risk of crime." *Ass'n of Cmty. Orgs. for Reform Now*, 435 F. Supp. at 414; *see also Pennsylvania Alliance for Jobs & Energy v. Council of Munhall*, 743 F.2d 182, 187 (3rd Cir. 1984) (upholding door-to-door canvassing prohibition after 5:00 p.m. Monday through Saturday because such a ban "after dark directly and precisely serve the towns' interests in preventing crime" and "protect persons from the annoyance of coping with uninvited solicitors at the dinner hour and in the evening").[22] The Court agrees with this reasoning.[23]

Finally, with respect to ample alternative channels of communication, Plaintiff Hall provided an affidavit indicating that LIA Network and herself "regularly engage in activities including street evangelism, pamphleteering, block walking (including handing out information on ballot propositions and candidates)…[and] fundraising that involves holding signs on the

---

[22] *But see Aptive Env't*, 959 F.3d at 999 (finding defendant city has not carried its burden of demonstrating that the harms it recites are real and that its restriction will in fact alleviate them to a material degree) (collecting cases). The concurrence in *Aptive Env't* notes the majority opinion fails to provide the defendant town any guidance on how it was supposed to further demonstrate the evidence required. *Id.* at 1000–01. Other courts suggest that homeowners could merely post No Solicitation/No Trespassing signs. *See e.g., Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 572 (6th Cir. 2012). Apparently, the remedy offered by courts finding that commercial and non-commercial interests in soliciting and peddling outweigh an individual's right to be left alone in their homes is to litter entire neighborhoods with signs.

[23] The Court finds that Defendant failed to introduce evidence to substantiate its argument that this Ordinance was required to combat crime. Accordingly, the Court only sustains the Ordinance based on the City's authority to provide for its citizens' peace, comfort and convenience. "While the quantum of evidence required to establish that an ordinance regulating door-to-door solicitation serves a municipality's interest in preventing crime or protecting the privacy of residents may vary from case to case, there is no sound reason for requiring a municipality to present extensive statistical evidence in order to prove what, already, is common knowledge. It makes little sense to prohibit a municipality from enacting an ordinance reasonably calculated to protect its residents from crime and/or to preserve its residents' right to privacy until residents actually are harmed or until the municipality reinvents the wheel by conducting exhaustive studies or compiling detailed statistics to confirm what already is known." *Ass'n of Cmty. Orgs. for Reform Now*, 435 F. Supp. at 401. Despite *Aptive Env't*, it "already is known" that the vast number of citizens do not wish to be awakened and startled in the wee hours of the night.

sidewalk." ECF No. 42-2 at 3. The Hours Provision does nothing to impinge on these preferred methods of communication. The Hours Provision only applies to residential properties. Likewise, Plaintiffs remain free to canvass, solicit, and peddle at individuals' homes at any time outside the curfew period. Thus, Plaintiffs have not established a strong likelihood of success with respect to their First Amendment challenge to the Hours Provision. *Ass'n of Cmty. Orgs. for Reform Now*, 435 F. Supp. at 416 (finding curfew imposed a "rather modest restriction" that left open ample alternative channels of communication).

### iii.  Signs Provision (Sec. 30-180)

The Signs Provision prohibits peddling, soliciting, or canvassing upon any private property in the City where the owner, occupant, or person legally in charge of the premises has posted at the entry to the premises, or at the entry to the principal building on the premises, a sign bearing the words "No Solicitors," "No Trespassing," or words of similar intent. ECF No. 41-2 at 5. As noted above, a valid time, place, and manner restriction must be "justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791.

The Court finds such a prohibition on both commercial and non-commercial speech at a particular place—private properties in which the owner or occupant expressly communicated their desire to be left undisturbed—to be content neutral. In seeking to prevent crime and to shield its citizens from unwanted speech, Defendant has identified particularly strong government interests. *See Frisby*, 487 U.S. at 484 (noting the Court has "repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom").

District courts in this circuit have upheld similar ordinances against First Amendment challenges. For example, in *Am. Cmty. Newspapers, LLC v. City of Plano*, the Eastern District of Texas upheld a city ordinance that prohibited individuals from distributing commercial handbills on any residential property if the homeowner displayed a "no trespassing" or similarly worded warning. 540 F. Supp. 2d 717, 719 (E.D. Tex. 2008). There, the court determined that the ordinance was narrowly tailored to the important government interest of crime prevention and protecting citizens' privacy because the ordinance "only prohibits what its citizens do not want, i.e. unwelcome solicitation. The ordinance merely enforces a resident's desire not to be bothered by unwelcome solicitation, irrespective of the organization involved." *Id.* at 721. Likewise, the Court finds that Defendant has narrowly tailored the Signs Provisions to its stated goals of protecting privacy and crime prevention.

Plaintiffs advance the strained argument that the Signs Provision is not narrowly tailored to achieving these interests because some homeowners with "No Solicitors" signs might still welcome a canvasser approaching their home to discuss a "charitable cause." ECF No. 42 at 14. Contrary to Plaintiffs' request, the Court will not ignore the plain reading of "No Trespassing" or "No Solicitor" signs to allow Plaintiffs to canvass at such homes in defiance of the previously expressed will of the occupant. Ultimately, a "city can punish those who call a home in defiance of the previously expressed will of the occupant." *Am. Cmty. Newspapers, LLC*, 540 F. Supp. at 723. And, again, the regulation "need not be the least restrictive or least intrusive means of furthering the government's interest." *Ward*, 491 U.S. at 798.

Finally, the Signs Provision also leaves open ample alternative means of communication. The only restriction imposed by this provision concerns in-person communication to homeowners who expressly indicate via signage that they do not wish to be disturbed. *See Am. Cmty.*

*Newspapers, LLC*, 540 F. Supp. at 723 (finding ample alternative means of communication because plaintiff "can still contact those who don't want its papers by telephone solicitations, mailing newspapers to the home, leaving a courtesy copy with the neighbor next door, or arguably leaving a copy of the paper on the sidewalk"). Plaintiff has thereby failed to demonstrate a strong likelihood of success on the merits for this challenge.

### iv.  Public Property Provision (Sec. 30-183)

The Public Property Provision makes it "unlawful for any person, to engage in commercial activities within the streets, street rights-of-way, or medians of the City." ECF No. 41-2 at 6. Such commercial activities include "selling, peddling, soliciting, hawking, or distributing orders for any services, wares, merchandise, or goods, such as flowers, candy, plants, or magazines." *Id.* As explained by Defendant at the September 5 hearing, the term "soliciting" incorporates the definition of "solicitor" into the Public Property Provision, thereby also capturing "[d]istributing a handbill or flyer advertising a service, requesting a contribution of funds or anything of value, [or] advertising services for educational, political, charitable, religious, or other purposes." *Id.* at 5. The Public Property Provision "does not include sidewalks or similar areas within the right-of-way but for which vehicles do not travel or use." *Id.* at 6.

Plaintiffs object that public streets and sidewalks occupy a special position in terms of First Amendment protection. In these "quintessential" public forums, the government may not prohibit all communicative activity. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Some courts have also found "medians and clear zones" to be traditional public forums. *See Waggoner v. City of Dallas*, No. 3:22-CV-2776-E-BK, 2023 WL 5516474, at *4 (N.D. Tex. July 20, 2023).

However, the Fifth Circuit has upheld the constitutionality of similar restrictions on soliciting in public streets. *See Houston Chronicle*, 488 F.3d at 616 (finding restrictions on soliciting or distributing any material to the occupant of a motor vehicle "within a public roadway" constitutional); *Int'l Soc'y for Krishna Consciousness, Inc. v. Baton Rouge*, 876 F.2d 494, 495–96 (5th Cir. 1989) (finding the following content-neutral regulation of public forum constitutional: "No person shall be upon or go upon any street or roadway or shall be upon or go  upon any shoulder of any street or roadway nor shall any such person be upon or go upon any neutral ground of any street or roadway for the purpose of soliciting employment, business, or charitable contributions of any kind from the occupant of any vehicle."); *see also Watkins v. City of Arlington*, 123 F. Supp. 3d 856, 861 (N.D. Tex. 2015) (granting summary judgment on behalf of city where plaintiff brought First Amendment challenge to ordinance prohibiting individuals "within a public roadway" from "solicit[ing] or sell[ing] or distribut[ing] any material to the occupant of any motor vehicles stopped on a public roadway.").

In evaluating an ordinance that prohibited solicitation on public streets, the Fifth Circuit determined that such content-neutral regulations are enforceable "if they are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Int'l Soc'y for Krishna Consciousness*, 876 F.2d at 497 (citation and internal quotations omitted). At the August 26 and September 5 hearings, Defendant asserted the important government interest of protecting "basic public safety" and guarding against traffic accidents. *See Houston Chronicle*, 488 F.3d at 622 (describing the goals of "public safety" and "prohibit[ing] the dangerous activity of solicitors' entering busy traffic intersections" as a "compelling interest at the heart of government's function"). The Court also finds that the Public Property Provision is narrowly tailored towards achieving this aim. As the Fifth Circuit has previously explained,

ordinances prohibiting solicitation in public streets may still be narrowly tailored even it "sweeps within its ambit *all* streets and roadways," without considering "the speed of traffic, the width of the neutral ground, the presence or absence of stop signs and traffic lights, etc." *Int'l Soc'y for Krishna Consciousness, Inc.*, 876 F.2d at 498 (internal quotations omitted).

Finally, the Public Property Provision leaves open ample alternative means of communication, including "sidewalks or areas within the right-of-way but for which vehicles do not travel or use." ECF No. 41-2 at 6. At the September 5 hearing, Defendant also explained that the Public Property Provision only prohibited individuals from engaging in commercial activities or distributing handbills if they stepped into public streets: they remain free to engage in such communications from the sidewalk, areas within the right-of-way, or adjoining public property. Thus, individuals have ample alternative channels of communication. *See Waggoner*, 2023 WL 5516474, at *11 (finding ordinance provided ample alternative means of communication where it did not regulate speech on "sidewalks, public parks, and medians wider than six feet"); *Watkins*, 123 F. Supp at 869 (upholding ordinance where it allowed individuals to "demonstrate on the sidewalks or other areas adjacent to the roadways" and "does not completely ban the distribution of literature, but rather limits the places and manner by which literature may be distributed").

Therefore, Plaintiffs have not demonstrated a strong likelihood of success at the preliminary injunction stage.

### B. Remaining Factors of Preliminary Injunction

Because Plaintiffs failed to establish a substantial likelihood of success on the merits, the Court need not evaluate the remaining factors required to grant a preliminary injunction. *Butts v. Aultman*, 953 F.3d 353, 361 (5th Cir. 2020) ("If the party requesting a preliminary injunction

cannot show a substantial likelihood of success on the merits, the injunction should be denied and there is no need for the court to address the other requirements for a preliminary injunction.").

## CONCLUSION

For the reasons detailed above, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion for preliminary injunction (ECF No. 42).

Defendant City of Kerrville is hereby **ENJOINED** from enforcing the Permitting Provision of the Canvassers and Solicitors Ordinance (Ordinance 2024-16) and the portions of Sec. 70-43 (a)(2) and (a)(8) of the Electioneering Ordinance (Ordinance 2024-15) identified above.

Plaintiffs' motion is **DENIED** in all other respects.

It is so **ORDERED**.

**SIGNED** this 6th day of September, 2024.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE